# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| GERALD JOSEPH LOVOI, derivatively on behalf of United Parcel Service, Inc., | ) ) ) | Case No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| CAROL TOMÉ, RODNEY ADKINS, EVA BORATTO, MICHAEL BURNS, WAYNE HEWETT, ANGELA HWANG, KATE JOHNSON, WILLIAM JOHNSON, FRANCK MOISON, CHRISTIANA SMITH SHI, RUSSELL STOKES, KEVIN WARSH, BRIAN O. NEWMAN, BRIAN M. DYKES, and NANDO CESARONE, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| UNITED PARCEL SERVICE, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

Plaintiff Gerald Joseph Lovoi ("Plaintiff"), derivatively on behalf of United Parcel Service, Inc. ("UPS" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and

belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Savage v. United Parcel Service, Inc., et al*., Case No. 1:24-cv-04591-SDG (N.D.Ga.); (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff, a stockholder of UPS, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least January 30, 2024, to July 23, 2024. During that time the Defendants (as defined herein) caused or allowed UPS to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.    As the world's largest package delivery company, UPS delivers tens of millions of packages each day in over 200 countries and territories. The Company offers air and ground package delivery services, and in 2023 the vast majority of packages delivered daily by UPS consisted of those sent via ground services. However, ground services provide the lowest average revenue per piece, $11.03, compared to $22.17 for Next Day Air.

3.      Beginning in January 2024, the Company provided investors with fiscal guidance for 2024. The Company initially projected revenues of $92.0 billion to $94.5 billion, and consolidated adjusted operating margin from 10.0% to 10.6%. The Company reaffirmed this guidance when it announced its financial results for the first quarter of 2024.

4.      What the Company did not disclose was that these forecasts were highly sensitive to the proportion of lower-value products in the total volume of products sold. Increases in volume alone would not be enough to reach the forecasted revenue or operating margin. The Company failed to disclose that an increase in the volume of lower-value products would negatively impact revenues and operating margin.

5.      When the Company announced its financial results for the second quarter of 2024, investors learned that an increase in lower-value products had forced UPS to revise its guidance down for the remainder of the year. On this news, UPS's common stock dropped more than 12% in a single day.

6.      Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A.    Plaintiff

7.    Plaintiff Gerald Joseph Lovoi is a current shareholder of UPS and has continuously held UPS stock during all times relevant hereto, and is committed to retaining UPS shares through the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of UPS and its shareholders in enforcing its rights.

### B.    Nominal Defendant

8.    Nominal Defendant UPS is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 55 Glenlake Parkway, N.E., Atlanta, Georgia 30328. UPS common stock trades on the New York Stock Exchange under the ticker symbol "UPS."

### C.    Individual Defendants

9.    Defendant Carol Tomé has served as CEO and a director of the Company since 2003.

10.    Defendant Rodney Adkins has been a director of the Company since 2013.

11.    Defendant Eva Boratto has been a director of the Company since 2020. Defendant Boratto served on the Audit Committee during the relevant time period.

12.    Defendant Michael Burns has been a director of the Company since 2005. Defendant Burns served on the Audit Committee during the relevant time period.

13.    Defendant Wayne Hewett has been a director of the Company since 2020. Defendant Hewett served on the Audit Committee during the relevant time period.

14.    Defendant Angela Hwang has been a director of the Company since 2020. Defendant Hwang served on the Audit Committee during the relevant time period.

15.    Defendant Kate Johnson has been a director of the Company since 2020.

16.    Defendant William Johnson has been a director of the Company since 2009.

17.    Defendant Franck Moison has been a director of the Company since 2017.

18.    Defendant Christiana Smith Shi has been a director of the Company since 2018.

19.    Defendant Russell Stokes has been a director of the Company since 2020.

20.     Defendant Kevin Warsh has been a director of the Company since 2012.

21.     Defendants Tomé, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes and Warsh are herein referred to as "Director Defendants."

22.     Defendant Brian O. Newman served as Executive Vice President and Chief Financial Officer of the Company from 2019 to June 1, 2024.

23.     Defendant Brian M. Dykes has served as Executive Vice President and Chief Financial Officer of the Company since July 9, 2024.

24.     Defendant Nando Cesarone has served as President U.S. Operations since 2020 and President UPS Airline since 2022.

25.     Defendants Tomé, Newman, Dykes, and Cesarone are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

29.     Venue is proper in this court under 28 U.S.C. § 1391, because UPS is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.     Company Background

30.     UPS is the world's largest package delivery company, delivering millions of packages each day in over 200 countries and territories. The Company has two reporting segments: U.S. Domestic Package and International Package. The U.S. Domestic Package segment offers air and ground package services, as well as SurePost, which provides ground service with final delivery by the U.S. Postal Service. In 2023, the vast majority of UPS's daily package volume consisted of packages sent via ground services. That year, the average revenue per piece was $22.17 for Next Day Air, and $11.03 for ground services.

**B.    UPS's False and Misleading Statements**

31.    From at least January 30, 2024, through July 23, 2024, UPS and its executive officers made materially false and misleading statements about the impact the proportion of lower-value products in the total volume of products sold on the Company's forecasted financial results for 2024.

32.    On January 30, 2024, the Company released its financial results for the fourth quarter of 2023. The press release issued that day included forecasts for 2024:

> **<u>2024 Outlook</u>**
>
> The company provides certain guidance on an adjusted (non-GAAP) basis because it is not possible to predict or provide a reconciliation reflecting the impact of future pension adjustments or other unanticipated events, which would be included in reported (GAAP) results and could be material.
>
> For the full year 2024, UPS expects revenue to range from approximately $92.0 billion to $94.5 billion and consolidated adjusted operating margin to range from approximately 10.0% to 10.6%.
>
> The company is planning capital expenditures of about $4.5 billion and dividend payments of around $5.4 billion, subject to board approval. The effective tax rate is expected to be around 23.5%.

33.    The Company held a conference call with investors and analysts that day. Attendees were provided with a presentation that included the following slide, which provided information on financial guidance for 2024:



**2024 Outlook**



- Projected U.S. small package market growth of <1%

- For International and Supply Chain Solutions, some improvement in market growth is expected later in the year

- Low-end of guidance range anchored to market growth and high-end assumes market share gains

- Expect revenue within a range of approximately $92.0B to $94.5B

- Expect adjusted operating margin* within a range of approximately 10.0% to 10.6%

*Non-GAAP financial measure.
© 2024 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color dark brown here are trademarks of United Parcel Service of America, Inc. All rights reserved.

34.    In her opening remarks during the conference call that day, Defendant

Tomé stated:

> Let me end by sharing our 2024 outlook. In 2024, the small package market in the US, excluding Amazon, is expected to grow by less than 1%. And projected market growth rates for the rest of our business segments picked up some improvement, but not until the latter part of the year. In building our 2024 financial targets, we incurred the low end of our guidance on market growth. And for the high-end of our guidance included growth we should experience if we capture market share.
>
> In 2024, we expect to generate consolidated revenue ranging from approximately $92 billion to $94.5 billion and a consolidated operating margin ranging from approximately 10% to 10.6%. Given the nuances of our new labor contract, there will be stark contrast between our first-half and our second-half performance. First-half earnings will be compressed and second-half earnings will expand. In both the low and high end of our guidance range, we expect to exit the year with US

operating margin of 10%. Brian will provide more details in a moment. UPS remains rock-solid strong.

35.    Defendant Newman stated in his opening remarks:

With 2023 behind us, let us move to our outlook for 2024. S&P Global is forecasting an improvement in global macro conditions as the year progresses.

Outside the US, real exports in Europe are expected to improve each quarter throughout the year. Looking at Asia, we saw positive momentum on the China to US lane exiting the year, and remain cautious on the outlook for 2024. In the US, the projected small package market growth rate is just under 1% excluding Amazon. A slight improvement is expected in US manufacturing and the consumer is expected to remain resilient despite lingering inflationary pressures. We've built a plan that reflects the current environment and potential risks that we see. This includes getting our organization to our strategy and aligning execution to our wildly important initiatives under what we call fit to serve. As Carol mentioned, we are exploring strategic alternatives for Coyote, our truckload brokerage business, which will enable us to address some of the cyclical impacts in our forwarding business.

And we are reducing our workforce by approximately 12,000 positions. This will cut around $1 billion in costs in 2024. Moving to our 2024 financial outlook, we are providing a range based on volume growth. The low end of the range has UPS growing at market rate and the high-end of the range as us gaining share. For the full year 2024, on a consolidated basis, revenues are expected to range from approximately $92 billion to $94.5 billion, and operating margin is expected to range from approximately 10% to 10.6%. In the range provided, we expect to move total average daily volume from negative growth in the first half of the year to positive growth in the back half. This is primarily driven by lapping the volume diversion we experienced in the US last year during our labor negotiations.

Additionally, cost will weigh on us in the first half of the year, primarily due to the higher labor cost inflation associated with the new contract. Looking at consolidated revenue, in the first half of the year, we expect

the growth rate to decline with a range of approximately 1% to 2% with the first quarter driving the decline. And in the back half of the year, revenue growth is anticipated to be up within a range of mid-to-high single-digits. Looking at consolidated operating profit, we expect material improvement as the year progresses with the second half of the year outperforming the first half. Lastly, we expect to generate our lowest consolidated operating margin of the year in the first quarter. Now let me give you a little color on the segments.

Looking at US Domestic, average daily volume growth is expected to be within a range of approximately flat-to-up 2% for the full year. At both the low and high end of the range, we expect the revenue per piece growth rate to outpace the cost per piece growth rate beginning in the third quarter and we expect to exit the year at a 10% operating margin. Moving to the International segment, we expect 2024 average daily volume to be within a range of approximately flat-to-up around 3%. At both ends of the guidance range, operating margin is anticipated to be in the high teens. And in Supply Chain Solutions, for the full year in 2024, we expect revenue to be within a range of approximately $13 billion to $13.5 billion. At both ends of the guidance range, operating margin for SCS is expected to be high-single-digits.

And for modeling purposes, in total below the line, we expect approximately $400 million in expense in 2024. This is net of $262 million in pension income. We included a slide in the appendix of today's webcast deck to provide you more detail on pension. The webcast deck will be posted to the UPS Investor Relations website following this call. Now, let's turn to full year 2024 capital allocation. Our capital allocation priorities have not changed. We are staying on strategy and we'll make the best long-term decisions to capture growth, improve efficiency, and deliver value to our shareowners. We expect 2024 capital expenditures to be within our target of around 5% of revenue or $4.5 billion. Now, let's turn to our expectations for cash and the balance sheet.

We expect free cash flow to be within a range of approximately $4.5 billion to $5.3 billion including our annual pension contributions of $1.4 billion, which are equal to our expected service costs. As Carol mentioned, the Board has approved a dividend per share of $1.63 for the first quarter. We are planning to pay out around $5.4 billion in dividends in 2024 subject to Board approval. Finally, our effective tax

rate in 2024 is expected to be approximately 23.5%. In closing, we look at 2024 as a year to pivot away from negative volume to positive volume growth and from high labor cost inflation to a much lower growth rate. We are laser-focused on executing our strategy, controlling what we can control, and improving our financial performance.

36.    In response to a question about forecasted operating profits in 2024,

Defendant Newman stated:

So, from a shape of the year perspective, the full year we called revenue at 1% to 4%. But based on lapping of the volumes and the contract overlap, we would expect revenue to be flat to down 2% in the first half, up 4% to 8% in the back half. And from a profit perspective, I had mentioned that it's a tale of two cities. In terms of halves of the year, the second half of the year, we'd expect profit to grow about 20% to 30%. So Q1 will be the biggest challenge because we're lapping from a volume comp perspective and a full contract. But on a full-year basis, we're looking at OP margin 10% to 10.6%. I think you can expect the second half of the year to be 11% to 12% in that range and you can back into the first half.

37.    Barclays analyst Brandon Oglenski asked about the expected volume and mix for 2024, and Defendant Newman responded:

We were actually pleased with the volume momentum. We were at a low watermark in August of last year, down 15%, and we saw sequential monthly improvement as we looked at our volume domestically from an ADV perspective, down to mid-single-digit declines in the month of December. So that trend continues to play out well. We're going to see some tough comps, though, in the first quarter, so I wouldn't expect positive volume growth in Q1. We start to see positive volume growth in Q2 and then certainly in the back half of the year as the comps change. SMB, Carol mentioned, very focused on penetration on the SMB side and specifically some of the medium SMB customers. We've stated we would like to see that mix trend up to 30% plus. We finished the year at 28%. So we're well on our way in that direction.

38.     UPS held its annual Investor and Analyst Day on March 26, 2024. That day, the Company discussed strategic initiatives, cost savings plans, and financial targets for the following three years. A presentation was provided to those participating in the conference call, which included the following slide during the portion presented by Defendant Tomé:



39.     On April 23, 2024, the Company released its financial results for the first quarter of 2024. The press release issued that day disclosed that UPS had consolidated revenues that quarter of $21.7 billion, consolidated operating profit of $1.6 billion, and diluted earnings per share of $1.30. Defendant Tomé stated: "Our financial performance in the first quarter was in line with our expectations, and

average daily volume in the U.S. showed improvement through the quarter. Looking

ahead, we expect to return to volume and revenue growth."

40.    The press release also reaffirmed the guidance for 2024 that had been

previously provided:

**2024 Outlook**
The company provides certain guidance on an adjusted (non-GAAP) basis because it is not possible to predict or provide a reconciliation reflecting the impact of future pension adjustments or other unanticipated events, which would be included in reported (GAAP) results and could be material.

For 2024, UPS reaffirms its full-year, consolidated financial targets:
- Consolidated revenue to range from approximately $92.0 billion to $94.5 billion
- Consolidated adjusted operating margin to range from approximately 10.0% to 10.6%
- Capital expenditures of approximately $4.5 billion

41.    The Company held a conference call with investors and analysts that

day. Attendees were provided with a presentation that included the following slide

noting the impact of product mix on revenue per piece:



42.    The presentation also included a slide on the guidance for 2024:



43.    Defendant Tomé stated in her opening remarks for that day's conference call:

U.S. average daily volume, or ADV, declined year over year, but the rate of decline slowed as the quarter progressed, ending with March down less than 1%. And on a sequential basis, the ADV decline rate in the first quarter showed marked improvement compared to the fourth quarter of 2023. This improving performance is primarily due to the efforts of our sales team to win and pull through new volume into our network.

44.    Defendant Newman stated in his opening remarks during the same call:

In U.S. Domestic, we remained focused on controlling what we could control to improve volume growth and drive productivity.

In the first quarter, average daily volume was down 3.2% year over year. When looking at ADV sequentially, the growth rate showed strong improvement compared to the third and fourth quarters of 2023. B2B average daily volume was down 5.5% compared to the first quarter of last year, primarily driven by declines in the retail and manufacturing sectors. And B2B represented 41.6% of our volume.
Looking at product mix and in line with recent trends, we continue to see a shift from air to ground as customers prioritize cost savings over transit times by taking advantage of our ground services. Compared to the first quarter of 2023, total air average daily volume was down 8.3%. Ground declined 2.3% and within ground, sure post volume grew 10.8%. For the quarter, U.S. domestic generated revenue of $14.2 billion, down 5%. Revenue per piece was relatively flat year over year. Looking at the key drivers, base rates increased the revenue per piece growth rate by 240 basis points. This was offset by a couple of factors.

First, changes in customer and product mix due to growth in sure post combined with changes in package characteristics decreased the revenue per piece growth rate by 180 basis points. And second, changes in fuel prices decreased the revenue per piece growth rate by 90 basis points. Turning to cost, total expense was down 0.8% or $104 million in the first quarter. Union wage rates increased 13% driven by the contractual increase that went into effect last August.

Leveraging technology and the agility of our integrated network, we took several actions which more than offset the increase in compensation. We leveraged total service plan and network planning

tools to reduce total operational hours by 6.6%, which was more than the decline in average daily volume. We closed 18 sorts and reduced operational resources by 4.8% compared to last year. We lowered block hours by 15.2% versus last year.

We reduced management and support staff by approximately 5,400 positions year over year. In addition, we reduced purchase transportation by 17%, primarily from our continued optimization efforts. And lastly, lower fuel costs contributed to the decrease in total expense. The U.S. domestic segment delivered $839 million in operating profit, down 43.6% compared to the first quarter of 2023, and operating margin was 5.9%.

\*      \*      \*

Looking at the shape of the year. In the first half of the year, we expect consolidated operating profit to be down between 20% and 30%. And in the back half of the year, we expect volume and revenue growth to accelerate as we lap the diversion we experienced as a result of our labor negotiations. Additionally, our labor cost growth rate will drop substantially.

We will also see the majority of the $1 billion in savings from Fit to serve. We still expect revenue per piece to outperform cost per piece. And lastly, in U.S. domestic, we expect to exit the year at a 10% operating margin.

\*      \*      \*

To wrap up, we are also reaffirming our three-year consolidated revenue and operating margin targets we put forth at our March investor and analyst day. Specifically, we aim to grow revenue to be between $108 million and $114 billion by 2026. The high end of the range includes inorganic opportunities, primarily in healthcare and international.

Additionally, we expect to expand our consolidated operating margin to more than 13% by 2026, which includes expanding our domestic operating margin to at least 12%. And I'll note that the USPS volume is consistent with our better and bolder approach to grow in the parts of

the market that leverage our integrated network, and it gives us a strong start to our 2026 targets.

45.     In response to a question about how the second quarter would improve

compared to the first quarter, Defendant Tomé stated:

> And maybe just a few more comments on RPP since our RPP in the U.S. was flat in the first quarter. We expect RPP growth as we head toward the back half of the year. Why? Well, first of all, fuel prices were a drag on the RPP in the first quarter.
> The projection for fuel is that is going to increase. We are also announcing a fuel surcharge later today. So those two components of fuel will be a bonus to RPP as we head toward the back half. We also are going to have a pretty picky peak, we anticipate for fewer operating days this year than last, which means the demand surcharge should be pretty strong this year compared to last year.
>
> And then, we brought in a lot of SurePost product into our network. We're meeting our customers where they want to go we'll be anniversarying a lot of that in the back half of the year as well. So we don't expect we love by the way, but we don't expect to see the drag on the RPP I'm sure costs in the back half, like we said, in the first quarter.

46.     David Vernon, an analyst from Alliance Bernstein, asked about

expectations for volume in the second half of the year, as well as the mix of volume.

Defendant Tomé responded:

> So from a volume mix perspective, if I look at the volume that's in our pipeline, I would say the volume that's in our pipeline is not sure cost. We've got commercial volume in our pipeline, additional enterprise volume in our pipeline. So we're going to be our customers where they want to go. But the mix is looking very different as we look ahead than it was in the first quarter.
>
> And in terms of pricing, I don't think we're going to talk pricing on this for this call but we always look for opportunities to optimize our pricing.

47.    The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that: (a) the forecasts did not take into account variation in the proportion of lower-value products in the total volume of products sold; (b) that the Company was emphasizing volume over pricing; and (c) that the forecasted financial results for 2024 depended on assumptions that customers would opt for higher value products.

### C.    The Truth is Revealed

48.    On July 23, 2024, the Company released its financial results for the second quarter of 2024. The press release issued that day disclosed that UPS had consolidated revenues that quarter of $21.8 billion, consolidated operating profit of $1.9 billion, and diluted earnings per share of $1.65. "This quarter was a significant turning point for our company as we returned to volume growth in the U.S., the first time in nine quarters. As expected, our operating profit declined in the first half of 2024 from what we reported last year. Going forward we expect to return to operating profit growth," Defendant Tomé stated.

49.    The press release also provided updated guidance for 2024:

**2024 Outlook**
The company provides certain guidance on an adjusted (non-GAAP) basis because it is not possible to predict or provide a reconciliation reflecting the impact of future pension adjustments or other

unanticipated events, which would be included in reported (GAAP) results and could be material.

For 2024, UPS updates its full-year, consolidated financial targets**:
- Consolidated revenue expected to be approximately $93.0 billion
- Consolidated adjusted operating margin expected to be approximately 9.4%
- Capital expenditures of approximately $4.0 billion
- Targeting around $500 million in share repurchases

50.    The Company held a conference call with investors and analysts that day. Attendees were provided with a presentation that included the following slide:

### 2024 Full-year Outlook
**Moving to point estimate as it represents best view of the many moving parts within our business**

| _Considerations_ | Outlook |
|---|---|
| _In 2024, expect global GDP to be up 2.7% and U.S. GDP to be up 2.4%_ | • Full-year 2024 Consolidated:<br>  • Revenue of ~$93.0B<br>  • Adjusted operating margin* of ~9.4%<br>  • Capital expenditures of ~$4.0B |
| _U.S. small package market growth <1% (ex. Amazon)_ | |
| _1H24 financial performance_ | |
| _U.S. product shift from 1H will continue through 2H_ | |
| _Includes roughly $1.0B in savings from Fit to Serve_ | |

- Full-year 2024 Consolidated:
  - Revenue of ~$93.0B
  - Adjusted operating margin* of ~9.4%
  - Capital expenditures of ~$4.0B
  - Free cash flow* of ~$5.8B, before any pension contributions
  - Dividend payout of ~$5.4B
  - Share repurchases of ~$500M
- U.S. Domestic 2H24
  - Revenue growth of ~5.0%
  - Average daily volume up mid-single digits
  - Anniversary the first year of Teamsters contract on August 1
  - 3Q operating profit up double-digits; exit year with adjusted operating margin* of 10%
- International 2H24 revenue up mid-single digits and adjusted operating margin* of ~20%
- Supply Chain Solutions 2H24 revenue of ~$7.0B, and adjusted operating margin* in high-single digits

_Considerations:_
- _In 2024, expect global GDP to be up 2.7% and U.S. GDP to be up 2.4%_
- _U.S. small package market growth <1% (ex. Amazon)_
- _1H24 financial performance_
- _U.S. product shift from 1H will continue through 2H_
- _Includes roughly $1.0B in savings from Fit to Serve_
- _Coyote revenue and operating profit remains in guidance_



© 2024 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color dark brown tone are trademarks of United Parcel Service of America, Inc. All rights reserved.

\* Non-GAAP financial measure. See Appendix for reconciliation to GAAP financial measure.    21

51.     The presentation also revealed how significant the impact was of the higher proportion of lower-value products on the Company's financial results:





52.    The Company held a conference call with investors and analysts that

day. Defendant Tomé stated in her opening remarks:

> So the key assumptions we use to build our plan are holding with one distinction, and that's US volume mix both in terms of product and customer segmentation. During the quarter, we experienced a shift toward value products, with shippers choosing ground over air and SurePost over ground. And there was also a notable shift in product characteristics with a surge in lightweight short selling volume moving into our network.
>
> *        *        *
>
> While we still expect an operating profit back up effect with solid earnings growth in the back half of the year, the growth rate will not be as high as we projected at the beginning of the year. Accordingly, we are adjusting our full year operating margin guidance to reflect the nature of the volume flowing through our US network. As a result, we now expect consolidated revenue of approximately $93 billion and a consolidated operating margin of approximately 9.4%.

53.    Defendant Dykes expanded on the impact of more lower-value products

on the expected financial results for 2024:

> While we saw strong volume growth in the second quarter led by B2C, it came with a different product mix. For the quarter, B2C volume increased 4.8% year-over-year and made up 58.5% of our volume, an increase of 220 basis points from a year ago. This growth was driven in large part by several new e-commerce customers that entered our network. B2B average daily volume finished down 4.6%. For returns remained a bright spot and increased 3% year over year.
>
> From a product perspective, we saw customers trade down between services. Specifically, we saw customers shift from air to ground and from ground to SurePost. As a result, total air average daily volume was down 7.8%, while ground average daily volume increased 2.3%. Within ground, SurePost average daily volume grew 25% driven by new shipper's product choices, product trade downs and easier comparisons

due to last year's decline in volume during our contract negotiations. By enhancing our matching algorithm, we saw an increase in the percentage of SurePost packages redirected to UPS for delivery. As a result, SurePost redirect increased returning to 2020 level.

Turning to SMBs. We saw the trend from the first quarter continue with total SMB volume down until June when it flipped positive. And in terms of total volume, SMBs made up 29.7% in the second quarter. For the quarter, US Domestic generated revenue of $14.1 billion, down 1.9% compared to last year. Revenue per piece was down 2.6% year over year. Let me break down the components of the revenue per piece decline. Base rates increased the revenue per piece growth rate by 90 basis points. The combination of product mix, lighter weights and shorter zones decreased the revenue per piece growth rate by 310 basis points. The remaining 40 basis point decline in the revenue per piece growth rate was due to the combination of changes in customer mix and fuel.

54.    In response to a question on the actual performance mix in the second

quarter, Defendant Dykes stated:

I think when you look at the domestic volume performance from the second quarter and then going forward, in the second quarter, there's really two big impacts that were driving the change. One is we did see customers favoring our more economical products, so going from air to ground, and within ground, from ground to SurePost. And that was across the broad base of customers. We also saw an acceleration of new entrants, new e-commerce customers that were coming into the market that are, quite frankly, running a different model than our traditional customers and are highly leveraging our SurePost product. So we saw an acceleration of SurePost.

The growth rate is also complicated as you think about what happened in the second quarter of last year because of the type of customers that diverted early. As we were approaching the Teamster contract, it does also skew the growth rate. As we move forward and you see -- you can see it in our forecast and within the guide, that we do expect the -- that mix to rationalize as we move towards the end of the year. And we've got line of sight to that in our pipeline and are working to actively pull

those through as we kind of balance the mix of products going into the second half.

55.    Defendant Tomé stated in response to another question on the shift to

economic products versus premium products:

> On the RPP, it's really interesting. We've had these new e-commerce entrants into the United States. And their volume, well, it's exploded. It was certainly more than we anticipate flowing into our network. So in -- to your question, is this a phenomena forever? I don't know. It depends on what consumer demand will be. But we're going to focus on the parts of the market that really value our end-to-end service and expect to see some of the pressure that we saw on the RPP in the second quarter moderate.

56.    Defendant Dykes added to Defendant Tomé's response:

> So as Carol mentioned, yes, we do expect the RPP growth to moderate in the back half. And actually, as we move from kind of the negative 2.6% that we're at to almost approach breakeven as we get towards the end of the year. And there's a couple of pieces of that. Carol had mentioned the B2B piece. I would say the bright spot within B2B is returns, that improved 3%. And we are seeing uptake with the addition of Happy Returns into the portfolio. And as that pipeline builds and we start to see that pull through, that continues to accelerate our B2B business.
> The other thing I would say is that we do have a strong pipeline of ground-ready products. And what happens with the SurePost product is it allows you to get new customers in, leveraging that. We get the integration into their systems, we get the pickups process set up, and then they become part of the UPS portfolio but then allows us to expand that as we go through the cycles.

57.    David Vernon, an analyst from Bernstein, questioned the reduction in

the Company's 2024 guidance in light of the heavier use of lower-valued products,

asking if the Company was focusing more on volume than value. Defendant Tomé

responded:

> So we're not chasing volume. We actually accepted new customers into
> our network with certain volume expectations that blew up on us. We're
> not chasing it. It's just their demand was much higher than we had
> anticipated. And so we are laser-focused on, focusing on the segments
> of the market that value our end-to-end network. Better not bigger has
> not gone away. We'll be managing through this. We need to manage
> through it, and we will be managing through it. So don't read anything
> into this other than we had new customers come into our network whose
> volume blew up. And we were able to serve that with the best on-time
> service of any carrier.

58.    Defendant Dykes added his own response to the question:

> And Carol, if I can just add one thing because I think the value of the
> volume is also very important. And while we had a lot more shippers
> in the network, it is important to reinforce this point that SurePost rides
> in the same theaters and the same hubs that all the other packages do,
> and it helped us drive incremental productivity. Our [shipping]
> utilization was up in the feeder network. Our hub productivity was up.
> Our preload productivity was up.

> And when you look at what that does with cost per piece, the US
> business was able to hold cost per piece to a 2.5% growth rate in the
> face of a 12% increase in compensation rate. So that alone is huge. Then
> you layer on top of that the impact it can have on the delivery side with
> the redirect and really driving stop-and-route density. It's -- the volume
> generates productivity improvements throughout the entire network,
> now we have the ability to manage as we move forward.

59.    Yet another analyst, Bruce Chan from Stifel Nicolaus and Company,

Inc., noted that the quarter's results were surprising, and asked why the Company

expected the volume mix to stabilize instead of declining further. Defendant Dykes

responded:

So certainly, on the first point around the RPP growth rate, I think when you take a look at the second quarter, you do have to remember, the comp is a big issue in the second quarter. And we did see quite a shift from Q1 to Q2. As we go into Q3 and Q4, we do expect the growth rate to moderate -- sorry, the negative growth rate to moderate. So it will improve to about negative 1.4% in the third quarter, negative 0.4% in the fourth quarter, and that will continue to improve as we go through the back half.

There's a couple of things that are going on there. One is we absolutely have line of sight to new customers that are going to be coming on that normalize the mix of volume that we have. And also, we have seen the wave of these kind of new entrants come into the market, and the volume levels are stabilized. And we're working with those customers on what those forecasts look like in the back half, so we have better line of sight to that.

Related to your second question, we invited these customers into our network. I think the idea of what they would look like if they weren't there, it doesn't really matter, right? Because they are, they're there. We found a way to make this volume very efficient within our network. And look, we'll continue to grow in the places of the market that are growing faster.

60.    On this news, UPS's stock fell from a close of $145.18 per share on July 22, 2024, to close at $127.68 per share on July 23, 2024, a same day drop of more than 12%.

61.    Analysts expressed their concerns just as rapidly. An analyst from J.P. Morgan noted that the corrected guidance for 2024 "reflects a concern that the company implemented a volume-over-price strategy which drove a significant amount of negative mix shift during the quarter when volumes from new e-commerce customers like Temu soared." The analyst further stated that "[t]he

company's strategy looks like volume now and price later considering record peaking surcharges." Barclays' analyst stated that "UPS management has been setting aspirational, yet unattainable, guidance since mid-2023 which we see as continuing into the back half of 2024 following a quite disappointing second quarter." The analyst echoed the concerns expressed by J.P. Morgan's analyst: "we see management as trading price for growth with the hopeful intention to lessen unit cost impacts looking forward."

### D. Defendants' Misconduct Has and Continues to Harm the Company

62. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *Savage v. United Parcel Service, Inc., et al*., Case No. 1:24-cv-04591-SDG (N.D.Ga.), as well as costs to be incurred in remediating deficiencies in the Company's internal controls. In the wake of the revelation that a higher proportion of lower-value products had a significant impact on the Company's guidance for 2024, analysts have questioned UPS's management and strategy, damaging the Company's reputation and goodwill.

### E. UPS Issues False and Misleading Proxy Statement

63. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue a false and misleading proxy

statement during the Relevant Period, including the Schedule 14A Proxy Statement issued on March 18, 2024 (the "2024 Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

64.    The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy before they were filed with the SEC and disseminated to UPS's stockholders. The Director Defendants negligently issued materially misleading statements in the 2024 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2024 Proxy allegations and related claims.

65.    In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

> Risk management oversight is an essential board responsibility. The board regularly discusses our most significant risks and how these risks are being managed. The Company's enterprise risk management process is designed to identify potential events that may affect the achievement of the Company's objectives or have a material adverse effect on the Company. The board reviews periodic assessments from this process and participates in the Company's annual enterprise risk survey. The board has delegated to its standing committees specific risk oversight responsibilities as set out below and receives regular reports from the committees on appropriate areas of risk management.

\*        \*        \*

**Audit Committee**

Oversees policies with respect to financial risk assessment, including guidelines to govern the process by which major financial and accounting risk assessment and management is undertaken.

66.    The 2024 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the impact of a greater proportion of lower-value products on the Company's revenues, operating profits, and other financial results.

67.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**F.    The Board Breached its Fiduciary Duties**

68.    As officers and/or directors of UPS, the Defendants owed UPS fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage UPS in a fair, just, honest and equitable

manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of UPS, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

69.     Defendants, because of their positions of control and authority as directors and/or officers of UPS, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding UPS's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

70.     To discharge their duties, the officers and directors of UPS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and UPS were required to, among other things:

            (a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal

authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and

make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

71.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

72.    The Board's Audit Committee is tasked with overseeing UPS's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of UPS's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Discuss earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.
- Discuss with management policies with respect to financial risk assessment

and management, including guidelines to govern the process by which major financial and accounting risk assessment and management is undertaken by the Company. Meet periodically with management to review the results of such assessments, including the Company's major financial risk exposures and steps management has taken to monitor and control such exposures.

- Discuss with management and the Risk Committee the guidelines and
  policies that govern the process by which enterprise risk assessment and risk management is undertaken.

73.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Boratto, Burns, Hewett, and Hwang conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

74.    In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate

information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

75.    The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on UPS.

## <u>DERIVATIVE ALLEGATIONS</u>

76.    Plaintiff brings this action derivatively in the right and for the benefit of UPS to redress injuries suffered by UPS as a direct result of the Director Defendants' breaches of fiduciary duty.  UPS is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.    Plaintiff will adequately and fairly represent the interests of UPS in enforcing and prosecuting the Company's rights.

78.    Plaintiff was a stockholder of UPS at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a UPS stockholder.

## DEMAND FUTILITY ALLEGATIONS

79.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

80.    The UPS Board currently has 12 members: Defendants Tomé, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Smith Shi, Stokes, and Warsh.

81.    Plaintiff has not made any demand on UPS's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### A.    The Director Defendants Lack Independence Because They Face a Substantial Likelihood of Liability

82.    As alleged above, the Director Defendants breached their fiduciary duties by negligently issuing the materially false and misleading 2024 Proxy soliciting the reelection of themselves to the Board. Accordingly, the Director Defendants face a substantial likelihood of negligence liability for issuing the 2024 Proxy and any demand upon these defendants is therefore futile.

83.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. As alleged above, the Director Defendants breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. The Director Defendants had a duty to

ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

84.    In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of UPS.

85.    The Director Defendants making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. If the Director Defendants were to bring a suit on

behalf of UPS to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to the Director Defendants.

### B. Defendant Tomé is not Independent

86.    Defendant Tomé is an executive officer of and currently employed by UPS. Defendant Tomé received compensation of $23.3 million in 2023, $18.9 million in 2022, and $27.6 million in 2021. Defendant Tomé depends on UPS for her income. In addition, UPS stated in the 2024 Proxy that Defendant Tomé is not independent pursuant to NYSE rules.

### C. Defendants Boratto, Burns, Hewett, and Hwang are not Disinterested Because They Were Members of the Committee Responsible for Overseeing Financial Reporting

87.    The Audit Committee oversees the Company's systems of disclosure and internal controls, oversees the integrity of the Company's financial statements, and oversees the Company's financial reporting processes. One of the Audit Committee's responsibilities is to discuss earnings press releases and financial information and guidance provided to analysts. The Audit Committee is also responsible for reviewing and discussing with management the Company's quarterly and annual financial statements. The Audit Committee was thus responsible for reviewing and approving UPS's filed Forms 10-Q, as well as the guidance communicated to investors and analysts, during the relevant time period. Defendants

Boratto, Burns, Hewett, and Hwang were members of the Audit Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, Defendants Boratto, Burns, Hewett, and Hwang caused improper statements by the Company. Accordingly, Defendants Boratto, Burns, Hewett, and Hwang breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

88.     Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

89.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

90.     Each of the Defendants owed and owes UPS the highest obligations of loyalty, good faith, due care, and oversight.

91.    Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

92.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

93.    In addition, the Director Defendants further breached their fiduciary duties owed to UPS by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that the forecasted financial results were highly sensitive to the proportion of lower-value products in the total volume of products sold. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

94.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual

knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

95.    As a direct and proximate result of the breaches of duty alleged herein, UPS has sustained and will sustain significant damages.

96.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

97.    Plaintiff, on behalf of UPS, has no adequate remedy at law.

**<u>COUNT II</u>**
**<u>Breach of Fiduciary Duty</u>**
**<u>(Derivatively Against the Officer Defendants)</u>**

98.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99.    The Officer Defendants are executive officers of the Company. As executive officers, The Officer Defendants owed and owe UPS the highest obligations of loyalty, good faith, due care, oversight, and candor.

100.    The Officer Defendants breached their fiduciary duties owed to UPS by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that the forecasted financial results were highly sensitive to the proportion of lower-value products in the total volume of products sold.  The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

101.    As a direct and proximate result of the breaches of duty alleged herein, UPS has sustained and will sustain significant damages.

102.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

103.    Plaintiff, on behalf of UPS, has no adequate remedy at law.

<u>**COUNT III**</u>
<u>**Violation of Section 14(a) of the Exchange Act**</u>
<u>**(Against The Director Defendants)**</u>

104.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

105.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

106.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2024 Proxy. In the 2024 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

107.    The 2024 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, UPS misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

108.  Plaintiff, on behalf of UPS, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2024 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of UPS and that Plaintiff is a proper and adequate representative of the Company;

B.      Against all of the Defendants and in favor of UPS for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.      Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.      Awarding UPS restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court may

deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims so triable.

Respectfully submitted this 13th day of November, 2024.

> */s/ David A. Bain*
> David A. Bain
> Georgia Bar No. 032449
> **Law Offices of David A. Bain, LLC**
> 1230 Peachtree St., N.E.
> Suite 1050
> Atlanta, GA 30309
> Tel: (404) 724-9990
> Fax: (404) 724-9986
> Email: dbain@bain-law.com
>
> **GLANCY PRONGAY & MURRAY**
> Brian Murray
> 230 Park Ave, Suite 530
> New York, New York 10169
> Phone: (212) 682-5340
> Fax: (212) 884-0988
> Email: bmurray@glancylaw.com
>
> **ROWLEY LAW PLLC**
> Shane T. Rowley
> Danielle Rowland Lindahl
> 50 Main Street, Suite 1000
> White Plains, New York 10606
> Phone: (914) 400-1920
> Fax: (914) 301-3514
> Email:      srowley@rowleylawpllc.com
>          drl@rowleylawpllc.com
>
> Counsel for Plaintiff Gerald Joseph Lovoi

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and 14-point font.


Dated:  November 13, 2024

　　　　　　　　　　　　　 /s/ David A. Bain
　　　　　　　　　　　　　David A. Bain
　　　　　　　　　　　　　Georgia Bar No. 032449
　　　　　　　　　　　　　**Law Offices of David A. Bain, LLC**
　　　　　　　　　　　　　1230 Peachtree Street, NE
　　　　　　　　　　　　　Suite 1050
　　　　　　　　　　　　　Atlanta, GA 30309
　　　　　　　　　　　　　Telephone: (404) 724-9990
　　　　　　　　　　　　　Facsimile: (404) 724-9986
　　　　　　　　　　　　　dbain@bain-law.com

　　　　　　　　　　　　　Counsel for Plaintiff